Case number 14-1131, ADX Communications of Pensacola et al. Appellants v. Federal Communications Commission. Ms. Alpert for the appellants, Mr. Carr for the appellate. Good morning. Good morning, Your Honors. I'm Dan Alpert on behalf of ADX Communications of Pensacola and ADX Communications of Escambia. This case involves a fairly outrageous situation that resulted from an FCC ruling whereby basically a number of radio stations owned by a competitor all are allowed to be co-located and early co-located. And as a result, but nevertheless, the FCC has determined that certain of these stations are in one market area and other stations are in the other market area. When you consider all these stations in the same market, it would be over the FCC's multiple ownership limit. The FCC's multiple ownership limit consists of eight radio stations overall in the largest markets, five stations of which can be in the same service, such as an AMF or FM station. In this case here, if you can imagine it, there's a tower, for example, in which broadcast stations operate from the same antenna. As far as the FCC is concerned, even though three of the stations are located on that same tower, they're not in the same market and they don't serve the same audience. It's a total fiction at this point. Same thing with other nearby stations. There are other stations nearby, only two miles away or 12 miles away, yet the FCC, because they're relying upon Arbitron, has a determining factor here in determining where the market station will be located. You agree that under the Arbitron standards, they're in different markets, right? Excuse me, sir? You agree that under the Arbitron standards, they're in different markets. Well, the FCC applied the Arbitron standards. Yeah, and you don't challenge. But if that's correct, they are in different markets, correct? Well, they're not intended to be the forever arbiter of what markets stations are. I'm just asking you that if the Arbitron standard is properly applied, then there's no problem here, correct? Your whole argument is that the Commission shouldn't have applied the Arbitron standard. In this particular case, yes, because they provide exceptions to the rule. That's correct, sir. So you have to win. You have to convince us that the agency's decision here to apply Arbitron was somehow arbitrary and capricious. That's what you have to challenge. That's correct, Your Honor. Okay. In this case here. And as I understand it, your main argument is that they shouldn't have applied Arbitron because in this particular urban area, this particular area, the Arbitron markets are too close, and this is really only one market, right? That's mostly right, Your Honor. That's your argument, but? For many of the stations that don't necessarily are not necessarily high-powered stations, they don't necessarily. When the Commission issued the Arbitron standard, they acknowledged that there are a lot of media markets that are just like that. Yes, they did, Your Honor, and because of that, they recognized the fact that the party should have the right to file a petition to deny, bring those specific situations to the Commission's attention, so it can resolve the situation properly in those situations. Right. It's not necessarily a one-size-fits-all sort of solution that the FCC adopted. They recognized the fact that the Arbitron solution would satisfy the vast majority of cases, but they recognized the fact that it would not necessarily satisfy all cases. In fact, they recognized the fact that contour methodology is more accurate than merely geographic designation, and they also recognized the fact that in certain cases that Arbitron, as a standard, is subject to manipulation. In no other market has there been a situation where so many powerful stations are owned by one party, all located within the same county, and yet they are considered to be some in one market, some in another market, and are claimed not to be in true competition with each other. That's the crux of the situation here that's problematic. So you say that the Commission failed to take a hard look at these facts and circumstances. That's correct, Your Honor. Yet the record shows that the Commission did take into account these circumstances and just reached a different conclusion based on its analysis as to why it was going to stick with the Arbitron rather than the contour methodology. Well, they never looked at the contour methodology. All they did was really look at Arbitron, and all they did basically is say that there were additional stations in the market, so therefore it's not like the cumulus stations in this case were the only stations that were in play here whatsoever, which isn't really the standard they should be applying. They should be looking at whether or not there's meaningful competition between these stations where they all serve the same service area, and as a result, whether or not the stations exceed the multiple ownership limits. I'm sorry. Are there no other situations in which you have what would be classified as adjacent Arbitron markets where you have signals that overlap? There probably are other situations where they overlap but not where they're owned by the same party. In this case, your cumulus owns six stations, which puts them automatically over the five limit by virtue of the market size that would be created if you look at a combined market situation. The more important thing is that if there are situations where such a thing exists, it's never been litigated, so I'd say in any of those situations, we're not the absolutely only case that might ever be litigated. I'm not saying that whatsoever, but parties should have the right to bring up that to the FCC and say people are straddling two different markets. Like, for example, if you look at Washington, D.C., and Baltimore, those are adjacent markets. If I say if you look at the market configuration of stations, there are stations that serve D.C. There are stations that serve Baltimore. There's no one that has a powerful enough station that somehow they can serve both areas or, for that matter, own six stations that serve really both markets. They're clearly defined markets, and there's clearly defined geography situations such that they basically are properly parceled between two separate markets. So the commission said that there will still be 10 different owners in each of these markets. That's correct, Your Honor. However, that's what the FCC said. However, that's not the test that's supposed to be applied by the FCC. What's supposed to be applied is not an antitrust test. It's whether or not you exceed the multiple ownership limit. So, in other words, there are plenty of markets. All right, but you agree that they are in different markets. You agree, I gather, that the commission found that there are 10 owners in each of these markets. Serve fragments of each of the two markets, yes. But I don't agree that these stations are truly. What did you just say? I didn't hear your word. I agree that there are other stations that serve fragments of each of the two markets. In other words, you're talking about a market here and a market here, and these stations exist in the middle. There are some stations that exist and serve this market here. There are some stations that exist and serve only this market here. Those stations wouldn't necessarily be competitive with the main stations, but the main key test is whether or not these stations serve both markets in a meaningful fashion so that they really should be considered together, rather than pretending as though they serve one market or another market. It's not like there's an iron curtain that somehow or another, because the station is designated as Pensacola market, that somehow or another you can't hear it in Mobile, and the same station located on the same tower at the same height, just because its designation is Mobile, that somehow or another it's only competing in Mobile. They're all competing together because of the geography and placement of the stations. And that's really the crux of the problem here for all intents and purposes. The Commission is trying to create a fiction here, and they're trying to ignore the reality of the situation when we laid out for them. In fact, you can see the map, if you haven't already, on page 14 of the brief, which shows these stations all are in competition with each other. Right. But the Commission has adopted this approach, all right? We disagree in this instance. And all I'm getting at is your brief saying they failed to take a hard look at the facts and circumstances. So that's why I was going over the facts and circumstances. They did look at them, didn't they? I don't think they really – there's no place in the Commission's decision where they ever looked at or suggested that they looked at the fact or conceded the fact that even though these stations do overlap and do provide service to each other and are in competition, that somehow or another that nevertheless the Arbitron rules should apply. There's no explanation like that whatsoever. From everything that's within the brief whatsoever, it's like they ignored that fact. They said Arbitron controls, therefore we're going to apply it. They complied with Arbitron, therefore we're going to apply it. They never gave any serious look whatsoever to the idea that, well, maybe this is an unusual case. Maybe this should be. They said it wasn't. Hmm? The Commission said it was not an unusual case or, as you argued it, a unique situation. Yeah. The only basis on which they said this is not unusual, they say there are other adjacent markets. We're not claiming there aren't other adjacent markets. We're claiming there's no other situation that's been presented to the Commission so far whereby one owner has taken advantage of the adjacent market situation, situated their station, so they realistically serve both markets, and as a result, the Arbitron rules should not apply. It's the facts that count, not simply the fact that there's adjacent markets or anything like that. The Commission says in its brief that you lack standing to challenge the two-year waiting period thing, and you didn't respond to that in your reply brief. Are you conceding that point? I'm not conceding the point, Your Honor. I believe that there has been an abuse and manipulation of the multiple ownership rules here and such that No, but wait, wait. They're saying you don't have standing to challenge it. At that one point, they're claiming we don't have standing. Not entirely, but No, I said with respect to the two-year waiting period. Yes, that's correct. Okay, so do you agree with the Commission? We don't have standing? No, I do not agree with the Commission. As to the two-year period. Yeah, just the two-year period. I do not agree with the Commission. Because you didn't respond in the brief. Yes. You had no response in your reply brief. Well, I think I did give a response. I think the Court can remand this to the Commission, nevertheless, with regard to it. We brought the case on a timely basis. We raised this. No, the Commission says you didn't file your appeal until after the two-year period had expired. Well, there was no period of time before that that we could have filed the appeal, of course. We could have filed it earlier or anything like that. What would be the remedy here? Let's assume we agreed with you that the two-year period has now expired. Well, if the two-year rule even applied to begin with, then we're in a situation where the Commission is basically conceding the fact that there was a manipulation that occurred because of the city of license change that occurred. There was a manipulation because I lost the last part of your sentence. Yes, there was one station that was licensed to a city of license within one of the Arbitron areas. An application was filed for a nominal city of license change. And that basically, even though the station did not change location whatsoever, stating the exact same location with the same power and everything, suddenly they just called themselves a different city. And that's the thing which got them in the door, which enabled them to use only the Arbitron rule for analysis. Before that, they would have had to use this contour overlap study, and it would have been able to comply, which actually gets back to an important point which hasn't been made yet. It's the whole idea that how is something where a certain cluster of stations, not in the public interest on day one, suddenly is in the public interest on day two just because of a reclassification of a city of license, but no change of facilities whatsoever? Can I just make your standing argument for a second? I thought your argument was this, that there's a rule that says, and we assume that rule to be applicable here for purposes of standing. The FCC has a response on the merits. But for purposes of standing, we assume a rule to exist that says that if you seek a change to the Arbitron methodology, you can't then apply for a license within a two-year period. And then what happened here is somebody sought a license within the two-year period. And so then the question becomes, well, more than two years have already left, so how would that give you any relief, to which your response, I take it, would be, well, what we're saying is the rule was violated because someone applied for a license within the two years, so you vacate the decision. And then, yeah, the same thing might happen again. You might reapply after two years, and the FCC might approve it again, but you have to go through that exercise. That's correct. That's basically the FCC's policy. That's correct. And so your argument is if you assume that, contrary to the FCC's determination on the merits, if you assume that this two-year rule does apply to this situation, the consequence of a breach of the two-year rule by the applicant is that then the FCC's decision gets vacated. That's correct. The FCC's original decision was erroneous in that respect. That's correct, Your Honor. Okay. I see I'm out of time. I'd like to have a moment to respond after the FCC, if I can. Thank you. Counsel for Respondent. Good morning, Your Honors. May it please the Court, my name is James Carr, and I represent the Federal Communications Commission. ADX was making an extraordinary request of the FCC here. It concedes that under a straightforward application of the FCC's rules, the transactions at issue here comply with the radio ownership caps. Notwithstanding that facial compliance, it argued that the FCC should deny those transactions because, according to ADX, they were not in the public interest. Now, to make that kind of extraordinary request and have the FCC grant it, ADX bore a heavy burden. Under Section 309d.1 of the Communications Act, it had to allege sufficient facts to show that these particular transactions were prima facie inconsistent with the public interest, and it failed to carry that burden. In the Bureau's order, Joint Appendix, page 511, the Bureau specifically found under the public interest analysis, ADX has failed to allege specific facts to indicate that, despite Cumulus's facial compliance with the Commission's rules, the applications pose a risk of harm to competition within the Pensacola automobile markets. Keep in mind, the concern here is a harm to competition. And the next sentence is critical. The numerical limits approach is designed to promote competition by assuring that a sufficient number of rivals are actively engaged in competition for listening audiences. That last clause is particularly important, actively engaged in competition for listening audiences. All that ADX presented the FCC with was technical engineering data about signal coverage areas involving these particular stations, where they could reach, where their signal reached. It provided no information whatsoever about whether these stations, in fact, competed in both Pensacola and Mobile. The mere fact that their signal can reach both markets does not necessarily ensure that they are actively competing for local advertisers. And Arbitron has looked at evidence, the sort of evidence that the Department of Justice looks at when it engages in antitrust analysis, market-based competition analysis. Why not? Why is it the case that actual competition, well, actual signal coverage overlap does not mean competition? Well, because what Arbitron has found in studying these markets is that it looks at evidence such as advertising revenues, ratings for these stations in particular markets. And in its experience, it has found that these stations, even if they reach both Pensacola and Mobile, tend to gravitate toward one community or the other. They don't actively compete or effectively compete in both markets. Just intuitively, I don't get it, because that might be the result of competition that it turns out that it's segmented. I guess I just don't understand why they're not actually competing for the same eyeballs. Well, here's the thing, Your Honor. You're looking at two separate municipal communities in two different states with two different sets of local advertisers. Maybe, maybe not. Well, again, but if you're going to question the Arbitron market definition, Your Honor, you're going to have to come forward with more evidence than just a map with a lot of circles on it about signal contour. What type of evidence would be required? Well, I think what ADX would have had to do would have been to come up with the sort of evidence that Arbitron was analyzing, advertising revenues, advertising strategies, ratings. I mean, this is a big company, all right? If you look at the concentric circles, I mean, they're all in the same market. I'm just trying to understand. I thought the whole purpose of the FCC's approach here was, and I'm not getting to its decision to use Arbitron as a measure, but it's simply that you wanted competition in the sense that the communities listening would be hearing from different voices. That's right, Your Honor, and that's why. Which is different, if I can posit, from where the station is looking for advertising. The two aren't necessarily synonymous. They aren't, but both considerations go into the numerical ownership caps. There are considerations about diversity of viewpoints. There is also a concern about economic concentration. The response here was there are ten owners in each market. That's right. And therefore, that's the end of the analysis, and that overlap is not unique. That's correct. And that's the end of the analysis. Yes, that's right. And again, I think the purpose, the public interest objective of the ownership caps is to ensure that there is not a concentration of radio stations in the hands of one or a few owners in the relevant local markets. So the question here is all about the way you define the markets. And that's all that the Commission's Arbitron methodology is interested in? Well, the Arbitron methodology is interested in – owns more than six stations, and the home is defined by the Commission, and you have these Arbitron ratings. That's the universe that the Commission has decided to look at in addressing these challenges. Well, that's right, Your Honor. And keep in mind, Arbitron is an industry standard. This is the way radio stations and local advertisers are able to judge the marketplace, and the Department of Justice uses that as well. Do you understand the disconnect I'm trying to understand here? I'm not sure I do, but please. For example, if you had 10 owners or 20 owners in one market, and they're all doing country music, all right? There are 10 owners, and they're all playing the same records, the same – it's true they're in different Arbitron markets. It's true there are 10 owners. The communities are hearing nothing but country, and the Commission doesn't care about that? Well, that's a separate question, Your Honor. Well, that's what I just want to be clear about, that the challenge here, where he talks about the Commission didn't give a hard look at what's going on here. Are you telling me that that is just not part of the relevant universe when you're challenging the Arbitron scheme that the Commission has adopted? I would say that the hard look here is whether or not there was sufficient evidence to determine that the Arbitron markets were not an accurate reflection of the state of actual market competition. That is – And so the answer to my question is yes? Well, again, I'm not sure – can you repeat the question? I'm sorry. Am I hypothetical? Yes. Everybody's hearing country and nothing but – Well, if everybody's hearing country within the same market – The Commission does not care about what the communities are hearing? Well, that's right. It's not so much a question of – I think the assumption is that if you have different station owners, they will presumably be looking for different niches in the marketplace, unless everybody in that market wants to hear country and nothing else. I understand that. The market will work. But the major – I don't want to live there. I'm sorry? I don't want to live there. Unfortunately, ADX's main station in this market has nothing but country. Even with 10 owners? Oh, yeah. But actually, the one thing that I wanted to point out, and the Commission's interveners pointed this out in their brief, is that ADX did not come forward with any evidence related to these particular 14 stations' competition in the signal contour area. So if it had come forward with evidence that the only thing listeners are hearing is country, that would have been irrelevant? No. That would have been irrelevant to this particular analysis, Your Honor. That's correct. Yes. So all we care about is corporate ownership and advertising revenues. Well, and the thought is that when you have a diverse group of owners, that it is likely that they will have diverse viewpoints or diverse programming formats. Now, part of that depends on the – But you just told me. You just told me. That's what I'm trying to understand about this system. You just told me whether everybody's hearing only country is irrelevant. That's not the Commission's concern. That's right. Well, I'm asking you as a counsel representing the Commission, explaining this rule, what is the universe that's relevant? And you have argued here today that the challenge failed to produce evidence beyond this technical tower strength data. That's right. And I'm trying to understand what evidence needed to be presented beyond technical capability. And the evidence would be evidence that, for example, they make the assumption that all of these stations, because they can reach both Pensacola and Mobile, must obviously compete in both Pensacola and Mobile. But that assumption is unsupported. And, in fact, I was curious – And what was the evidence that you would present other than tower strength? I think you would present evidence along the lines of what Arbitron has studied, advertising revenues for these stations in the different markets, their ratings. Are they, in fact, gaining sufficient audience in both Mobile and Pensacola to be a real factor in those markets? It was interesting – In other words, your point is even if their signal overlap, there can still be real competition. Yes, because at least the way Arbitron has seen it, these stations – I thought what you said was even if their signals overlap, there might not be competition. Isn't that correct? Well, the way Arbitron has seen it, even when these stations have overlap into both markets – There might not be competition, right? These stations tend to focus on one market or the other. So they're not all – The six stations that ADX is focusing on, some of them have been assigned to Pensacola, some of them have been assigned to Mobile. That is due to the nature of their programming and the competitive statistics, the advertising revenues. To challenge that, the petition here would have to come up with evidence showing that in this particular market, that's wrong, that these stations are in fact competing with each other, contrary to what Arbitron says, right? That they are competing with each other in both Pensacola and Mobile. What ADX was trying to argue was that at least in this area, Pensacola and Mobile were effectively a single market. Yeah, I guess what I'm saying is even if their signals overlap from the same owner, they still have competition. That's the point. You certainly could. That's right, Your Honor. Can I ask you quickly about the standing question that was raised earlier about the two-year rule? Yes. I guess I'm not quite following your argument in the following sense that if what the two-year rule means to do is to prevent an applicant from exploiting a change in the Arbitron methodology that they themselves sought, then it's sort of like saying we want to prevent the appearance of impropriety. So what we want to do is we want to make sure that someone doesn't game the system by going to Arbitron, getting some sort of change, and then immediately turning around and getting a benefit from that from the Commission. Now, if somebody does that within the two years, they've reached that rule. It doesn't matter then if two years have elapsed already because they've reached the rule. And so the answer would be, well, then you vacate because they should have waited two years. They didn't. And then you let them apply again. So then they're standing because the party we get the benefit from. So it doesn't tell you, obviously, on the merits, you can still prevail on the ground that the two-year rule just doesn't apply to the circumstance at all. I take your point. I think that probably would be a possible remedy. I don't think there is any merit to their argument if the court should reach the merits. I don't think there's any merit to their argument regarding the two-year waiting period. It clearly was limited to these Arbitron-based decisions. For the Commission to have extended it here to a community of license change would have been beyond the existing rule and there was no reason to do it. And the Commission explained why on the merits. That's right. Let me just pursue that because I had exactly the same question, Judge Srinivasan. I thought your answer was going to be, look, if this court, if we say that it's, if we send it back because if we address the two-year issue. Right. And let's assume there's a violation of that. I understand your argument on the merits, but just assume for a minute you have a case where there was manipulation of the Arbitron standards, okay, but not a change in community of interest. Yes. And so under those circumstances, that applicant at that time, that application should have been judged by the Commission under the pre-Arbitron rules, right? I thought you were saying. That's right. Yes, but since the two-year's up, if you send it back, the two-year's are up, the Commission's going to apply the Arbitron standards and the result will be the same. It would apply. Is that your argument? Yes, that is the argument. So that's like a redressability argument, right? It goes to redressability. That's right. Okay. Even if there had been a manipulation, the party was entitled after two years to rely on that change going forward. Even if it had manipulated it. Even if it had been manipulated. And therefore, if we decided, if in a different case where there was a plain, clear violation of manipulation and we sent it back, the Commission, since the two-year's is up, the Commission would say, all right, the two-year's is up, we're going to apply Arbitron, the result's the same. So in terms of Article III, your point is there's nothing redressable here, correct? That's it. There's no remedy here for ADS. Well, I don't know that necessarily it would reach the same result. I mean, what you're saying is you can predict, you can reliably predict that you would reach the same result. Maybe I'm misunderstanding. No, I don't think you are misunderstanding. I think the Commission would, if the issue were to be remanded to the Commission, the Commission would apply the same standard it had applied before. Because the two-year's are up. Because the two-year's are up. So then no one would, I mean, the Commission doesn't move fast enough. No one could ever challenge this under your theory, right? Because two-year's, you're never going to get it done in two-year's, are you? I suppose the answer to that would be, Your Honor, that if the Commission could just wait two-year's and protect itself. If a party really wanted to challenge this and ensure that it could challenge this, it would presumably ask the Commission to stay its hand pending judicial review, or it might seek mandamus from a court and try to get. I suspect I know what the Commission would argue if they sought mandamus.  I know that standard. No one's going to give me a mandamus in a case like that, so that's not an option. Well, that's the only option I can come up with in this circumstance. Anything further? I have nothing further. I just ask that the Court affirm the Commission in this case. Thank you very much. Thank you. Counsel for Appellant? Thank you. Just three points I want to quickly make. The Commission, the main problem I have with the Commission's argument is that, again, engages in a number of fictions, just like it does with respect to coverage, as I argued previously. First of all, their basic assertion is that these stations do not actively compete in some way or form. Some are focused on Mobile Market, some are focused on Pensacola. They operate from the same tower. I mean, come on. For the Commission to claim that, first of all, there's no evidence whatsoever that their assertion is right. All they are is testifying, and I'm not even sure on what basis they're testifying that these stations, some focus on Pensacola and some focus on Mobile. There's absolutely no evidence in the record one way or the other with respect to that. Another fiction that they're operating under is they keep saying that Arbitron does this, Arbitron does this, Arbitron does this. The fact of the matter is that Arbitron is a private company. In many respects, it accommodates station owners. And there's no evidence whatsoever in the record here that Arbitron ever studied these stations in any way or form to see whether or not they actively compete. The fact of the matter is Arbitron only assigns stations to one market or another market. It's largely based on FCC's legal license. Excuse me. The Arbitron standards were challenged in court in the Third Circuit and sustained. So they're- Generally, it works just fine. You're not going to succeed by challenging the Arbitron standards. I am not challenging the Arbitron standard in general. I'm just saying that for them to say in this particular case that Arbitron studied anything is overreaching, totally overreaching. And the third point I want to make, as far as a fiction here, is that when you're talking about the number of competitors within a market that exists, if in other cases there are situations where three owners parse out basically the stations and just are up to the limit but not over the limit, the FCC has never studied whether included in their decision-making process whatsoever that, okay, it's all right because they're under the limit and because there's a sufficient number of owners in the marketplace, in which case, in my hypothetical, there would be only three. Ten, three, whatever. The question is, unfortunately, the FCC's analysis is simply whether or not you're above or under the multiple ownership limit. The level of competition is not a valid test that they should be applying in this case whatsoever. All right. Thank you. Thank you. We will take the case under advisement.
judges: Rogers, Tatel, Srinivasan